Good morning, your honors. My name is Jack Tucholsky and with me at council table is Ms. Dara Ann Dunning. We represent Northern Plains Resource Council whose ranchers own the surface estate where some of this coal mining is taking place. I'd like to reserve, if I can, three minutes of my time for rebuttal. This case ultimately is about water in a thirsty land and even though the ranchers cannot undo the split estate, they can hold BLM to the highest standard that NEPA imposes. I want to begin with the cumulative impacts argument because the district court erred when it said that the cumulative impacts are simply hypothetical and that they don't need to be analyzed. By we call the life of the mine area, which is indicated on ER 92, and the cumulative mine area, which is the area that we call the mirror image mine to the north. And that, you know, the total amount of land there is 20,000 acres. We're dealing with a huge chunk of land and it is undisputed in this record that this area to the north, the cumulative mine area, has not been analyzed in any sufficient detail. And if you will take a look at SCR 2, it's a map that was submitted, it's part of the record here, and it shows these long wall panels that and it's simply a straight shot to continue those panels into this cumulative mine area that has never been analyzed. And the reason we contend that that is reasonably foreseeable is that it's the same coal seam with the location of this new lease. They have a straight shot with their long wall mining equipment. It is adjacent to the existing mine facilities. It's adjacent to a 32 mile rail spur, so transportation is no problem. BLM has expanded this mine since 1990 on a continual basis. And we think under Ninth Circuit case law, which says you don't have to have a plan, as long as it's reasonably foreseeable, that there can be some level of analysis that would look at the big picture. And that's really the problem here, Your Honors, is that BLM has piecemealed this. Beginning in 1990, they did an EIS on a land exchange, but there was no analysis. The state did an analysis in 1992, but you can't tier to that analysis. We've done, the state has done some piecemeal EAs every time they upped the permit, and in 2008 they did the EA on this. But there's never been a big-picture look. And my clients obviously are concerned about water and subsidence. We know that there case law in this circuit has been clear that this piecemealing is not the way that NEPA was designed. And a big picture could certainly be taken, a big-picture look, for this cumulative mine area. And the district courts just simply said the cumulative mine is hypothetical, and therefore we don't, they bought the BLM's that you can't limit reasonably foreseeable actions to those that have been approved or funded. This case, Natural Resources Council versus Brong said that the cumulative impacts analysis by its nature has to predict some future conditions. And that's okay, that there's some uncertainty is inherent in the process, but that is not a reason to proceed, to not proceed with the case. Right, but at some point there has to be a tipping point, right? There's possibilities where anything can be possible, right? Anything can be hypothetical, yeah. And so the BLM's not required in those instances. So why is this instance different? You're saying it was foreseeable and so forth. What are you pointing to that the BLM either missed or misconstrued to take it out of the sort of possible to a foreseeable? Well, as I stated earlier, I think there are a host of objective facts that bring this within the ambit of what this circuit considers reasonable. What are your strongest? That it's the same coal seam, that SER2 shows the panels going straight north into this cumulative mine area, that the facilities are in place. If you look at the Jones case, for example, which is where they said a cumulative impacts analysis was not allowed. In the Jones case, the plaintiffs were saying, look at these other chromium mines. And the Ninth Circuit said, you know, the same company doesn't own the mines. There are other insurmountable permitting and land use obstacles and so forth. So that, you know, it's that's not reasonably foreseeable here. But this is federal coal. The facilities are in place and there's nothing in the way. And indeed, if you go back and look at the record, BLM when it first started looking at this lease, stated, you know, the director, James Sparks, wrote a letter to the company and said, we have to do an EIS. The reasonably, and I'm quoting the ER on page 129 now, the reasonably foreseeable development mine plan, which has already been conceptually developed and shows potential additional arguments to the north, developments to the north of the record. And there's a number of other sites in our brief where the agency is saying, we need to look at this now before we lease 130 million tons of coal and open up the potential to lease, you know, another two or 300 million tons of coal. Now, granted, the agency can change its mind. And just because in the process they said that, you know, we're not going to, you know, we're going to acquire an EIS and look at cumulative impacts, you know, certainly there are cases that say this preliminary stuff is not binding. And that's not my argument. But again, if you look at the cases, for example, the Butte Environmental Council case, which is a Ninth Circuit case, which said it's okay for the agency to switch positions. In that case, and this is a quote from the court, it says, in addition, they prepared a supplemental draft EIS that resulted in modifications that reduced potential impacts. And the court had no problem discerning why the agency changed its mind. And that's my point here, is that there's nothing on this record to show why the agency said, we need to do an EIS and we need to look at cumulative impacts for this mirror image mine to the north. And then they had a meeting with the coal company. And then they came out and said, we're going to do an EA. Let me just add, I didn't mean to interrupt you in the middle of a sentence. I don't need to do that. But I just wanted to know where this term, mirror image mine, came from. Your Honor, it's a term that the parties and the BLM have used since the very first environmental impact statement was prepared back in 1992. That's the term that has been used. And it is anticipated that whatever happens in that under the current mining operation, is that a fair assessment? I think it is. It is a fair generalization, but that's not an assessment. This area has... OK, but would you agree that this case is rather unique in that what you're suggesting, the expansion into the north, has been illustrated by a laboratory in the south? Because we've had all this experience with what has happened in the south. And there's nobody suggesting that there's going to be anything very much different happening in the north with this same kind of mining that's going on. Now, you correct me if I'm wrong. OK, and I would disagree with that, Your Honor, because we have streams, we have springs, we have underground aquifers and so forth, that in general, the impacts of coal mining are going to be the same. But in terms of what NEPA requires is some specificity in the analysis. And until they actually look and see how the hydrological patterns are, to see where the springs are, to see what the subsidence might be, because the surface changes relative to the coal seam, you don't know. And what NEPA requires is a hard look, not just simply to say, well, the effects were like this here, so they're probably going to be like this in the mirror image mine. And so I agree with your point, Your Honor, in a general sense. But NEPA requires more. It requires the hard look. And that isn't present here. Are you relying on that in response to Judge Levy's question? Just following up, it sounds like you're relying on the failure to look at the specific layout of the land. As opposed to a change in the technique to be employed. Is that right? That is correct. Yes, it has to do with the in this north area, the topography is different. The drainage patterns are different. The surface ownership is different in terms of, you know, the ranching operations and so forth. You're not worried about the different methodology? We are not worried about the different methodology. I just want to also touch on this supplemental environmental impact statement issue because the district court, frankly, was wrong on its analysis. And the BLM has sort of talked out of both sides of its mouth here. They said, you know, that, well, we didn't really tier to this 1990 and 1992. But the IBLA, which is the final agency action, squarely said that they're upholding the CA on the basis of tiering. And the district court, on page 24 of its orders, says that Northern Plains correctly notes the EA was tiered to the 1990 and 1992 EIS. And that, quote, BLM acted within its discretion when tiering to the 1990 and 1992 EISs. And that is wrong as a matter of law. And it's not a trivial thing because when you strip away those earlier EISs because they were not properly tiered to, then the 2008 EA becomes even more bare. Well, it seems uncontested from the briefing that the 1992 EA would be, or rather EIS, would be out of bounds had that really been tiered to. I'm curious to know what you think we ought to do by way of defining tier. It's a defined term. And yet in the case law, it's used pretty inconsistently. Well, I think the CEQ regulations are a good place to start with that. And that, you know, it has to be a federal document that's gone through the NEPA process. And it the way it's talking about the verb to tier the tier. I'm not talking about what the 1992 is because I think that's uncontested as well. And I accept your proposition, your legal proposition about why that ought not to be tiered to. What I'm looking for is how you think we ought to interpret our case law and the regulation regarding what it is to tier to something. So I think the best analogy I could give would be when the Forest Service creates this forest plan covering like three million acres and they do an EIS. And then they implement a timber sale on 10,000 acres. And then they can properly tier back because the forest plan EIS is a programmatic EIS. And it's a site specific action that tiers back to it. So here's my question. I'll try it one more time because I don't think I'm asking it very clearly. Sometimes in context, the term seems to be used to simply mean incorporate by reference. And sometimes it means something more than that. And that's what I'm trying to get at. OK, I think it means something more than that. I think it means when they tier that they actually can use the data, the analysis and the facts and just sort of carry it whole cloth into the EA and apply it so they don't have to go back and redo it. Because it sometimes is used just to mean incorporate by reference. I'm wondering about this argument you're making that it is wrong as a matter of law for the district court to have referenced the 1992 document that way. How do we know that it meant tiering as a term of art? I can only go with, you know, the plain language, the words of the court and the regulations as we set them out. And the court used the word tiering and we took it at face value. And I see I have a minute left and I'd like to hang on to it if I could. OK, thank you very much. Thank you, Your Honor. Good morning. My name is Jeff Beeler. I'm here on behalf of the federal appellees in this case. I'm joined by John Martin, intervener's counsel for Signal Peak. And I'd like to spend about 10 minutes of my time and give him five minutes to address the court. I'll start where the court left off. I think you're absolutely right, Judge Christin, that the Interior Board of Land Appeals, when it used the word tiered in referring to the documents, it used it in the general sense. In other words, they've been incorporated by reference. And I think we point this out in our brief that when you look at the actual record, the environmental assessment here, if it really was tiering in the same sense of what the CEQ regulations would require, then what you'd expect to see somewhere in this record is something along the lines of we have this effect and we're tiering it to previous analysis. You don't see that. The only time that these documents are mentioned is in an early introduction in the environmental assessment. When you say documents now, are you referring to 1992 and 1990? Yes, Your Honor. There's a bullet we listed out in our brief, but we're referring to the agency referred to the resource management plan. It referred to the 1990 EIS that was completed by the Bureau for the land swap. It referred to the 1992 state permitting. It referred to the state permit itself. There's a number of documents. And basically what I think the agency was doing there is just saying, here's ongoing analysis that we have been engaged in since all this is going on. There's ongoing mining. These documents are referenced. And it gives, when you look at the record, it gives an example of why that's important and why they're being referred to. But then you never see any other mention of those documents later on in the environmental assessment. So that's my point to say, look, there was no tiering. Even if the court were to find that there was tiering, I think that you have to look at the regulations that we're talking about. And it would be entirely appropriate to tier back, even though we don't think it happened, to the 1990 EIS. So to the extent that there's any tiering, which again I dispute, the 1992 tiering, it didn't have any prejudicial impact on the outcome here. This environmental assessment was based on ongoing, updated, up-to-date information. It's clear in the record that the agency was looking at not just previous information they'd collected, but information they'd collected since ongoing mining operations have been occurring at the Bull Mountain site. And we know that since 2009, the longwall mining has occurred. As predicted in the earlier environmental analyses, subsidence has also occurred. And we know that because as the coal seam is mined, the surface estate does go down. And there are effects of that, no doubt. The agencies are monitoring those effects. The signal peak is required to engage in ongoing mining or monitoring. And to the extent that anything would occur, then they would address that. But since 2009, we've yet to observe any negative impacts. And that's an important fact, because that's why the agencies had a finding of no significant impact here. Now, when we're talking about cumulative impacts analysis, and I think this is important. First, and I think we explained this in our brief, as to the cumulative impacts analysis, I think plaintiffs, we think plaintiffs are wrong on the law. They have not read the case law correctly. But even if you were to adopt their reading of it, they are ignoring the record here. So we pointed this out. And this is at excerpts of record 90 and 91, where you have the cumulative impacts analysis. And so first on the law, we were not required to look at the northern deposit of coal. And the reason why is, we don't know what's there. And Judge Levy, you're absolutely right to suggest, look, they're calling it a mirror mine, but how do we know that it's going to be a mirror? And we don't. The bottom line is that we don't. We don't know what the geological characteristics of that coal deposit are. We don't know what it would look like. And the Bureau specifically said, we don't know what technology would be used. So yet. Right, but the Bureau, yet, yet, the Bureau initially thought there would need to be an EIS. And that that was a contemplated project. And, you know, your opponent is arguing that was the Bureau's position. Of course, he's acknowledged that the agency's entitled to change its mind. But that it's changed its mind and hasn't told us why. What is your response to that? So, Your Honor, a couple things. One, these were initial meeting notes that, I think we explained this in our brief, that, look, these were the initial, under the regulations, when the, when Signal Peak comes to the Bureau and says, look, we want to continue mining. They have to come up with a draft environmental assessment or they have to engage in a dialogue with the Bureau as to what the environmental analysis is going to look like. And absolutely, we acknowledge, at a first impression, there was a, someone from the Bureau who wrote at, based on the meeting and then a subsequent letter and suggested that, yes, there may, may have to do an environmental impact statement. And it may have to look at this conceptual northern mine. But then in the same documents that they are relying so heavily on, in those same documents it specifically says, you know, we are going to continue to work with you to develop our analysis. And so when you look at the record here, what you see is not a definitive position as to this is absolutely what has to happen. But, in other words, to say, look, we are going to engage in this environmental analysis with you. As we go through this analysis, things could change, right? And that's exactly what happened. I think the initial draft environmental assessment was something like 50 pages. The thing that ended up being produced in the end was 220 pages. So to the extent that the analysis needed to be done, it was here. And so I think the agency absolutely explained why it changed its mind, because you can look at the environmental assessment and see exactly how it addressed the concerns. And here, in particular, and this is my point, that, like, what else would you have us do? Okay, so we don't know what the mirror image mine looks like. We don't know what the geological characteristics of it are. And we certainly don't know whether long wall mining would be used. To the extent that we do know anything, what we do know is we know based on ongoing operations. And based on ongoing operations, and we say this in the record, is that if mining were to occur at that northern mine, it would look a lot like the mining that's going on right now. And we know that. And so to the extent that it would be cumulative, these are the kinds of effects that we would see. And we acknowledge subsidence would indeed occur, but that we have yet to observe any impacts to the water, to the groundwater, or to the aquifers or anything like that. So to the extent that the plaintiffs are complaining about effects that have not been observed, that the agency was very clear, if there were future mining, it would look a lot like exactly what's going on right now. And in terms of the case law, you know, I point the court to the Jones decision that we disagree on the reading of that, but in the Epic case, that was a Forest Service case, talking about agency's requirement to analyze cumulative impacts. And those cases stand for the proposition that we've articulated in our brief, which is agencies are not required to do the impracticable. And to the extent that the agencies are required to engage in this kind of analysis, it would look exactly like what the agencies have done here. And the Bureau lays that out in the record. I'd like to talk a little bit about mitigation. This is their third argument. They didn't really touch on this. You know, they say that this is a mitigated environmental assessment, and that's not right. And I want to be clear here, this is, they're taking things out of context. And we've laid this out in our brief. Context matters, okay? It matters where you're talking about mitigation. This is in no way, shape, or form a mitigated environmental assessment. The extent that the agency talked about, if there were some kind of effects that were observed, that under Montana law, there's a Montana permit in place for this mine. Under Montana law, the agency would be required, Signal Peak would be required to mitigate those effects. We've yet to observe any effects to groundwater or to the surface water. So this is not a mitigated environmental assessment. And the agencies have not in any way, shape, or form, shirked their responsibilities here. Is that requirement for mitigation strictly within the parameters of what the state will permit or require? Or is there some additional requirement that comes from the BLM? So my understanding, Your Honor, is that the lease itself has certain requirements for monitoring and then lays out requirements that Signal Peak would be required to take if this ongoing monitoring showed that there were any effects, they would have to take those actions. But under the Surface Mining Control and Reclamation Act, what you have is sort of cooperative federalism. So you have both the federal agencies engaging in approving, in this case, a lease. You also have another federal agency within the Interior Department that would approve the actual mining operation. You have the state of Montana that permits the mine. So across the board, for all of the mining operations that are ongoing here, you have agencies that are supervising that mining. So I ask the court to affirm the judgment in favor of the federal appellees in this case. Has any mitigation activity occurred so far? No, Your Honor. And the reason why is because we've yet to observe any effects. So to the extent that there's been rock slides, to the extent that we've seen surface cracking, we're aware of all of that. We talk about that. It was predicted. We knew that subsidence would occur. We have yet to see any impact to the groundwater or to surface water. And the reason, quite frankly, is it's hundreds of feet below the surface that the mining is occurring. And between that, and this just maybe for geography here, there's sandstone, there's various levels that are protecting that surface water. And we're not seeing any impact. So there's been no need up until now to do any kind of mitigation.  Thank you. Thank you, Your Honor. Good morning, Your Honors. I have one more, one question that I want to pose to you since we've been talking about mitigation. I think in your brief, you make the point that there is no bond. In response to that, the respondents or appellees say, yes, there is. Now, can you tell us there is still an issue about that? Or what about it? Your Honor, I represent Signal Peak. And I can tell you as a matter of certainty that there is a bond. Let me also add that this is something that is a function of a federal statute, albeit it's implemented by Montana DEQ. So hopefully that responds to the question. If I may, just by way of background, my name is John Martin. And Your Honor, I represent Signal Peak Energy. And I'd like to talk, if I may, about some of the issues, Judge Levy, that you've raised in your questions. One of your questions was, what about mitigation? Do we really have mitigation in this instance? And I don't want to get caught up in the nomenclature, because I agree with Mr. Beillard. We haven't found it necessary to do any physical mitigation anywhere on the mind. But what we have done is mitigation that is of the sort that, Your Honor, that as Judge Levy, you decided in the panel in Greenpeace Action back in 1992 that is described as mitigation. We have monitoring that's been undergoing now for roughly 20 years. At present, we monitor 141 different springs and seeps in the area of the mine. In addition to that, Your Honor, we've done topographical surveys. They're required both by the state permit, and they may be required by the stipulation from BLM, but certainly they're required by DEQ. We've done seven topographical studies of the mine. So we have a great deal of data already. Beyond that, we've also prepared a groundwater model in the area. So again, we have a level of detail that's relatively unusual, quite frankly, particularly for an area of this nature. Let's talk for a moment more about cumulative impacts. The focus of plaintiff's argument now is the northern deposit. In truth, what's going on there is we don't know if it will be mined. We do know that there's a deposit there. We don't know the extent of the deposit. We don't know the nature of the mining that will be done. We don't know when it will be done. This is not one of those situations of the sort that one addressed, for example, in the Cutty Mountain case, where there were actual timber sales that had been proposed. Indeed, Your Honor, this is actually more remote, Judge Christin, than what you addressed in the Loud case, the Snow Basin case. In that case, as you may remember, you pointed out, the panel pointed out, that there needs to be an identified proposal before the obligation to evaluate in detail cumulative impacts. You pointed out and approved a regulation that required active preparation to make a decision. We don't have that in this case. There is no proposal. There is no active consideration on the part of BLM, or for that matter, any other agency of mining the northern deposit. This plainly is not something that should be considered in a detailed cumulative impacts analysis. Let me also say that there's a risk associated with conducting it at this point in time. If BLM were to evaluate this at this stage, there's a sincere risk that they would make a mistake. They don't know the nature of the mining that will occur. They don't know when it will occur, and they certainly can't evaluate the environmental impacts from it. Let me say that this is more akin to the EPIG case in 2006. That was an interesting case because there the court said, we do have some amount of information about a timber sale that might occur in the future. And so what the court approved in that 2006 decision was what it described as a reasonable discussion. Here we have a reasonable discussion of what could transpire in the nature of the impacts that could occur if that northern deposit were mined. With that, your honor, I see that my time is running out. Thanks very much. And obviously, if your honors have questions of me, I'd be pleased to answer them. Judge Levy, any questions? No. Thank you, counsel. Thank you very much. Put two minutes on the clock, please. We took a little of your time, so go right ahead. Thank you, your honor. I need to clarify something that the Department of Justice said. And when they say there's been no observable effects, my clients would strenuously disagree with that today. But that's not part of the record for this case. But I just need to note that in terms of mitigation and the success and the impacts already. I think the essence of our case is that there's never been a big picture analysis of what could happen in this area. And counsel said, you know, we don't know enough about the north area, the Mirror Image Mine. We don't know how much coal's there. We don't know what the hydrology is and so forth. And that's the point, that they haven't taken the hard look at that. And if they did, and this is not just an idle request to create more paperwork. You know, my clients, as I said, you know, water is the lifeblood of ranching. And if the BLM takes a harder look, it's our hope that they will impose some real mitigation. Now the mitigation is simply, if there's a problem, we'll try to fix it. And as far as the bonding goes, the bonding is for the reclamation. We would love for BLM to put a bond to require the company to make good on its word to replace water. There's no bond in place to absolutely require the replacement of water. The mitigation, and this is set out in our brief, if you look at it, it's really very vague. And it's our hope that if they do an EIS, they will impose mitigation that is far more specific for the surface owners. In terms of the argument that BLM actually has done some kind of a cumulative impacts analysis, I would encourage the court to look at RER 91, which is the EA at page 4-56. The cumulative impacts analysis, and you know, we're talking 20,000 acres potentially of mining, is a couple of paragraphs. We think the impacts are going to be the same. And as I said, at the end of the day, NEPA is all that my clients really have. And I see that I'm out of time. And if I could just finish my sentence, I'll sit down. Hang on, you can certainly finish your sentence, but we're not necessarily done with you. So go ahead. Thank you. You know, at the end of the day, NEPA is all they have. There's nothing illegal about coal mining, and we get that. But we think that the purpose of this law is to require the hard look, which will lead to a better decision. And that's all we can hope for at this point. Thank you very much. Hang on one second. Judge Levy, did you have another question? No, I did not. Thank you. Thank you very much. Thank you, counsel. Thank you. All right, a bit of a peculiar schedule today. We're going to go ahead and stand in recess and conference this case. And then we'll be back at 10 to hear the remainder of the arguments on the calendar.
judges: Leavy, Christen, Kobayashi